## C. N. JANEWAY v. STATE.

No. A-4146.   Opinion Filed May 12, 1923.
(214 Pac. 933.)

(Syllabus.)

**Homicide—Appeal—Error in Favor of Appellant.** In a prosecution for murder, where the court submits the issue, and the jury find the defendant guilty of manslaughter in the first degree, where the law and the facts make the crime murder, the fact that the jury found the defendant guilty of a lower degree than that established by the evidence is an error in his favor, of which the defendant cannot complain.

Appeal from Superior Court, Creek County; Gaylord R. Wilcox, Judge.

C. N. Janeway was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Thompson & Smith, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. This appeal is from a judgment of conviction of manslaughter in the first degree, the punishment having been assessed at imprisonment in the penitentiary for the term of five years.

The defendant is not represented in this court by counsel; we have nothing before us but the petition in error and case-made. The information charges that in Creek county, on or about the 21st day of April, 1921, defendant, C. N. Janeway, did kill and murder one J. W. Colclazier. The evidence shows that deceased conducted a wholesale grocery business in the town of Oilton, and employed defendant and defendant's wife for about two years, their employment ending several months before the homicide. In the month of March defendant told his wife that he had been informed that she had been criminally intimate with deceased. She strenuously denied the accusation and protested her innocence. He also accused deceased of being criminally intimate with his wife. Deceased denied the accusation. Defendant later stated to several persons that he intended to sue the deceased for damages for his wrongful conduct, and stated to others that he had given deceased 30 days to wind up his business and leave the country. On the morning of the tragedy deceased went to the post office, and, leaving there, went into a grocery store, the second door from the post office. Defendant was standing in the

store near the door. When deceased came in neither spoke. Deceased went to the rear of the store and spoke to Fred Nayfa; then turned and walked towards the door, again passing defendant, who shot him in the back as he reached the door. The bullet entered near the spine, coming out near the navel. He staggered out the door, and was taken to a doctor's office, and from there was taken to a hospital at Yale, where he died the following day.

Fred Nayfa testified:

"My grocery is the second door from the post office. Janeway came into the store, and I asked him if he wanted anything. He said 'No,' and put his elbow on the showcase facing the door. In four or five minutes Mr. Colclazier came in. He had some letters in his hand. He passed by Mr. Janeway, and asked me where my brother was. He waited about three or four minutes, reading some letters; then he walked back to the door, and Janeway shot him as he was going out the door. Janeway was about 10 or 12 feet from him when he fired the shot. Janeway went back into the toilet, and stayed there 10 or 15 minutes."

Dr. Ellis testified:

"I met deceased on the street. He said, 'Doctor, come back to the office and examine me; I am shot.' I took hold of his arm, and went back to my office with him. I probed the bullet wound, and found that it entered the abdominal cavity. I said 'Well, Jim, it has gone into the cavity.' Then I took him to the Yale hospital, and Dr. Profit operated on him. The bullet entered about an inch to the left of the spine, and came out about an inch and a half to the left of the navel. I was present when deceased made the statement which was taken down by the assistant county attorney. It was just prior to his death."

There being no objection, the written statement was introduced in evidence. It reads as follows:

"Yale, Okla., April 24, 1921.

"My name is J. W. Colclazier, and I live at Oilton, Okla. On the 22d April, 1921, one C. N. Janeway was in the Traders' Grocery in Oilton, Okla., about 10:30 a. m. I did not say anything to him (C. N. Janeway). Was there only a few minutes. When I started out of the store some one shot me in the back. There had never been any trouble between myself and C. N. Janeway. There was never any intimacy between C. N. Janeway's wife and myself. I think they (C. N. Janeway and wife) were framing up on me. C. N. Janeway tried to get $1,500 from me Saturday night in the pool room. No one was with him. At the time we were alone. Witness to his statement."

The evidence shows that he made this statement about two hours before his death.

As a witness in his own behalf defendant testified:

"I worked for J. W. Colclazier for about two years and a half, and my wife worked for him at the same time. Mrs. Colclazier was the first person that told me about my wife's relations with her husband. It was on the morning of the 11th of March. She said, 'Did you know Jim and your wife is thick?' I said, 'No; how do you know they have been?' she said, 'Didn't Bill tell you the news? He saw them coming out of the barn night before last.' I said, 'That can't be true.' I went home and asked my wife, and she said it was not true. I asked Bill Vannoy, and he said he saw them coming out of the barn, and he would face Jim Colclazier any time I called him Colclazier came to the office, and of course he denied it, and, I don't know, it was kindly like a dream to me; I was in so much trouble; I don't remember all. Mr. Russell and Sam Harris and Clarence Patton told me they had talked to Mr. and Mrs. Colclazier, and also to my wife, trying to get a settlement, and told them that I would not settle. I did not demand in the pool hall or any other place $1,500 from Colclazier. On the morning of the shooting I was traveling south, and Colclazier was coming north on the east side of the street.

I stepped into the Traders' Grocery to keep from meeting him. I was standing there in the store leaning against the counter, crying, when Colclazier came in. I would have gone out on the street again, but I was crying, and I hated to have the public see me crying. As he passed me going out of the store he said, 'You son of bitch, I will get you yet,' and made a turn and put his hand back this way. Then I suppose I shot him. I thought he was going to make a gun play on me, and I thought it was up to me to do it first. I did not realize what I was doing.''

On cross-examination he testified:

''I had several interviews with Colclazier after this trouble commenced. He always denied being guilty of anything, and always said my wife was a good woman. He denied coming out of the hay barn with her. I asked him to face my brother-in-law, Bill Vannoy, and tell him that he did not come out of the hay barn. Then we went over to the office, and Vannoy said he saw them coming out of the hay barn. Colclazier said it was not so, and Vannoy said he was a liar; it was so. Then I told Colclazier I would give him 30 days to clean up and get out of the town, and he asked me to stay within the bounds of the law, and I told him I would do that.''

The defendant's wife testified that she had been criminally intimate with the deceased for about a year and a half.

Dr. J. W. Phillips, a physician at Oilton, testified in answer to a hypothetical question, that, in his opinion, the act of the defendant in shooting the deceased was that of an insane man, and that he was insane to the extent that he did not know right from wrong.

Three or four witnesses qualified, and testified that the defendant's general reputation in that community for peace and quiet was good.

In rebuttal the state called Dr. A. D. Young, of Oklahoma City, and Dr. G. W. Griffin, medical superintendent of

the State Hospital for the Insane at Norman, who qualified as alienists, and, in answer to a proper hypothetical question, each gave as their opinion that defendant was sane when he committed the homicide.

This is a sufficient statement of the evidence to show the issues presented for the determination of the jury.

The errors assigned are that the verdict of the jury is contrary to law and to the evidence, errors of the court in admitting incompetent evidence, and errors of the court in its instructions to the jury.

The theory of the prosecution appears to have been that the killing was an assassination. The theory of the defense was that the defendant shot in self-defense; and the further defense of insanity was interposed. While the defendant is not represented in this court, we have carefully gone through the record, and find it free from substantial error. The instructions of the court, to which no objection was made or exceptions reserved, fully covered the law of the case, including self-defense and the defense of insanity.

The record shows that no exceptions were reserved to the rulings of the court on the admission of evidence, and there was no objection made or exception taken to the statement of deceased which was admitted as a dying declaration. The well-settled rule is that dying declarations can be admitted only to prove the circumstances attending or leading up to the homicide; and, while the statement admitted went beyond this, still exceptions are necessary to protect the technical rights of a defendant on trial.

Considering the evidence in the case, there can be but little doubt that the homicide was a deliberate and premeditated murder; and, while the defendant's account of the kill-

ing differs somewhat from the other testimony in the case, he is, we think, guilty of murder upon his own statement. It would seem that the demands of justice and the protection of society clearly required in this case that the defendant should have been found guilty of murder. However, the court submitted the issue of manslaughter in the first degree, the jury found the defendant guilty of this degree, and assessed the minimum punishment. Juries frequently render such verdicts, and this can only be accounted for upon the theory that their verdict was the result of a compromise of opinion.

Finding no material error in the record, the judgment of the lower court is affirmed.

MATSON, P. J., and BESSEY, J., concur.